here at Kaminsky. Thank you. May I reserve five minutes? My name is attorney Rachel Bearden. I represent the appellant, Joseph W. Kaminsky Jr. Are you asking for five minutes or three minutes? Oh, I'm sorry. Three minutes, Your Honor. Yes. Seven and three. Yes. My name is Rachel Bearden. I represent the appellant, Joseph W. Kaminsky Jr. In this case, this appeal is about two broad issues and six law enforcement officers. The broad issues are the Fourth Amendment exception of the knock and consent and the scope of the curtilage Fourth Amendment protection in this particular case. This circumstance arose in December of 2011. Just to be clear, so the First and Second Amendment claims are no longer in this case. Correct. We limited this appeal to the issue of the knock and consent and the curtilage issue that were decided by the district court judge in a decision January 12th, 2018. So these circumstances arose on December 11th, 2016. One Coventry police officer and two state police officers arrived at Mr. Kaminsky's property in Coventry. It's a matter of agreement in this case that there were no exigent circumstances. No one's claimed exigent circumstances and there were not. We claimed that the officers, the state police officers on the route from Middletown, Connecticut to Coventry passed at least eight courthouses where they could have sought a search and seizure warrant. Instead, they went directly to the property and relied on the knock and consent entry rule. In this case? Yes. I'm sorry. In this case, though, didn't Mr. Kaminsky invite everybody in? Well, when they arrived there, they indicated to him that he was a felon, which turned out not to be true. Before they said that, there was an officer who he recognized. Lieutenant Solinsky from the Coventry Police Department. And didn't Mr. Kaminsky wave him in after the officer said, may we enter? Well, Lieutenant Solinsky said, may we enter? And Mr. Kaminsky, knowing the lieutenant for a period of time, did allow him entrance. Not for the purpose of search because he didn't know that they... Wait, wait, wait. We're talking about the entry, don't you? Yes. So you just said that he waved the lieutenant, by the way, whom he referred to as Walter, which doesn't sound like he... He said, hi, Walter, which doesn't sound like he's feeling terribly intimidated. And he waves him in. Tell me what's wrong with the entry. Well, what we claim on appeal, because the state police filed their motion for summary judgment later on, we claim that the entry by Detective Matson and by Detective Matson and Bimbo from the state police was not consensual. But wait, there's three people standing there. Solinsky says, may I come in or may we come in? Mr. Kaminsky testified that he believed that Walter was asking to come in. He didn't even know who the other two police officers were. Well, he said he believed that. Was there anything that would indicate to the officers that it was only the lieutenant who was invited in? Yes, because the officers, before they went to Mr. Kaminsky's house, collected at the Coventry Police Department to stage how they were going to go about this entrance. And when they met at the Coventry Police Department with Lieutenant Solinsky and some other officers, they planned it that way. Again, at the doorway, Lieutenant Solinsky says, may we come in? And your client gestures to come in. What would suggest, what would indicate in that interaction to a reasonable officer, the local officers standing with Solinsky, that they were not invited in? Well, because Lieutenant Solinsky knew that by staging it, so he would be the first one there, that Joe Kaminsky would ask him in because he knew him. Well, that's great. That's good police work. Tell me what would say to one of those other officers who are also, they're local officers from the same town, right? No. They're the state police. Yes. Okay. So what would indicate to them that they are not encompassed in that invitation? What about the behavior of your client would possibly suggest to a reasonable officer that he was saying, Lieutenant Solinsky, you can come in. I don't know those other guys. They have to stay outside. What would tell them that that's what was intended? Well, certainly the police officer's own actions would tell them that that's what a reasonable person would do because otherwise Detective Mattson and Detective Mbimbo would have went alone to the house and knocked on the door. Why wouldn't it be perfectly sensible to say, we want somebody that he knows. We don't want to just come up as strangers and let that person be our spokesperson. That seems like a perfectly reasonable thing. I'm still looking for what in the interaction would indicate that the invitation was limited. Because he knew Lieutenant Solinsky and waved him in. He never said the other officers can come in as well. And once they got into the house, then they asked him if he could search and he called his attorney and he told his attorney, they say I'm a felon. We now know he's not. They want to take my guns. What do you say? The attorney said, let them do it because... Well, all right. So again, now we have a consent on the advice of an attorney inside to a search. And by the way, in terms of a search, did any of these officers go rummaging around in things? Is that the testimony? Or isn't the testimony of Mr. Kaminsky that he went and said, there's a gun, here's a gun, I have some in here and there's some in that closet. And then they took them. Well, in Connecticut, criminal possession of a firearm because you're a felon carries five years for each count. He had 59 firearms in his house, whether or not... Excuse me, do you have any case that says that when a person acting on the advice of his attorney says, you can look here, you can take this item, that that is unconsented? I don't know of any case where the police come to your house, claim you're a felon, want to take your guns under duress, you give them to him and you're not a felon. Where is the duress? You're not a felon. Explain to me the duress that is here. Because it's five years for each count. He has 59 guns. He's facing hundreds of years in jail. And so he wants to cooperate and he's not a felon. They came to his house. If they would have gotten a warrant, a judge or a prosecutor would have reviewed that warrant and said, this guy's not a felon. Don't go to his house. Barbara Mattson testified that she never uses... Excuse me, please. What is the problem with their being mistaken about his being a felon? I'm sorry, I need to back up. There's no requirement that they go get a warrant if they get consent. So the fact that they could have gotten a warrant, or they could have applied for a warrant, is totally irrelevant, isn't it? No, the whole purpose of the Fourth Amendment warrant requirement is to prevent things like this, to have a neutral magistrate review it who would say, gee, since 1964, has there been any legislative history? Because how did the ATF... Excuse me, you've read Schneckloth against Bustamante, right? Excuse me? You've read Schneckloth against Bustamante. Yes, not related to this case. So the Supreme Court has told us that consent is an exception to the warrant requirement. And unless under the totality of the circumstances, the consent could be found to be coerced, it is a valid substitute for a warrant. And there's no requirement that consent not be asked for when you could get a warrant. There's no case that says that. Well, we certainly assert in this case that it was under duress because he's threatened with hundreds of years in jail. I cite to... Did any officer say to him, you're going to jail, buddy, if you don't let us search? Okay, so he's an FFL... Can you say yes or no to that? Did any officer say that to him? No, but he's an FFL. He's owned firearms for over 50 years. To be an FFL, you have to know the law. He very well... He had a pistol permit. He had a right to sell through Coventry. He knew what it meant when officers come to your door and say you're a felon and you have 59 guns in your house. He knew what that meant. And his attorney knew what that meant, too. And his attorney was under the belief that his client was a felon. After all, when the state police tell you you're a felon, most people believe them because they figure they have the information, but they're wrong. Is there any evidence, any indication whatsoever that these officers were lying intentionally, that they knew that he was not a felon? There is no evidence that they knew that, except if you go by Detective Mattson's history with the department. She had... I think she was the longest serving member of the firearms. She'd been with the state police for a long time. She was the go-to person in the firearms unit, and they did not do their due diligence. The whole point of the warrant... So your argument is, at most, negligence, right? It goes beyond negligence and not getting a warrant in this case. In footnote 10, which I cite to a Tenth Circuit case, an opinion by Justice Gorsuch, he wrote that the whole concept of the search warrant requirement is being outmoded or not used because of the knock and consent. The exception has swallowed the rule. And if you look at this case, you can see why the exception can't swallow the rule, because it was so obvious that this man wasn't a felon, and they came to his house. Am I missing something? You don't seem to have addressed the qualified immunity issue in your brief. I have not, because I don't think they should have qualified immunity. But you haven't addressed it. No. The Fourth Amendment is clearly established law that you need a warrant to go into somebody's house. It's clearly established. It doesn't provide for a mistake because... It provides for a consent exception also. Every officer knows that. Officers act on that every day. Could you get to the curtilage issue at all? I will get to that. In particular, to qualified immunity in that respect? Well, with regard to the curtilage issue, there was the recent case of Collins v. Virginia from May 29, 2018, 138th Supreme Court at 1663. That's a decision, that's why I asked you to address qualified immunity, that postdates this episode. So is our decision in the United States against Alexander. So is the Supreme Court's decision in Florida against Jardines, all of which clarify the concept of curtilage. So to the extent that one could say that, and I think it's a pretty plausible argument, that the officers were, the hanging back officers were on his curtilage, most of the cases that one would cite to establish that are ones that postdated this activity. Some of them even postdate the district court's decision. And a federal judge thought that they were not on his curtilage. So I'm having a little trouble why you could say that a reasonable police officer would have known that he or she was on the curtilage back at the time of this episode. And that's why I'd like you to address. Yes. The district court used the four done factors and in his decision went through those factors piece by piece. We used those factors as well, and we went through them piece by piece and we came to a different conclusion. We also pointed out that the... ...skilled lawyers could differ. Well, they always differ. Isn't that some manifestation of the fact that reasonable minds who are trained in the law differ on whether it's curtilage? Well, but in any case, there's a winner and a loser. So obviously, whoever loses disagrees with the judge. But the issue we are dealing with in terms of qualified immunity is whether reasonable officers could also differ. No. This is... No. You have one view and argued that it's curtilage. Judge Shea had a different view and said that it wasn't a curtilage problem. The Supreme Court and other courts have clarified that since that time. But how do you expect officers to have reached the absolutely correct determination that ultimately the Supreme Court reached later on? Because the fourth factor that the district court judge used, the fourth done factor that he used, the steps taken by the resident to protect the area from observation, one factor that he used is that my client, a United States Marine Corps veteran from the Korean War, flew a flag in his backyard, and because of that, that was an invitation to outsiders that they could come on. I argue it's the exact opposite. When you put a flag in your backyard, it stands for everything that the United States of America is. It stands for the Fourth Amendment. I mean, just liken it as an analogy to maritime law, when a ship flies its flag. It's not an invitation to come on the ship. It's an invitation to say, I support the United States of America. I support the Constitution. I support the Fourth Amendment. And that doesn't mean you can just come onto my property and violate my rights. Isn't it a problem, isn't it, you have to say that it is a problem, isn't it, isn't it that the property abuts a public lake, that there is, that there is no fencing or enclosure at the back of the property? Well, there's the stone wall. There is, there is a stone wall, which is more than most people have on a lake. I mean, I just think of the ramifications of an analysis like that, where people can't afford to have large yards. They live, they live in areas that, where it's a dense population. They must not have any curtilage rights. We're not here setting policy, which we wouldn't do anyway, but debating policy under current, the Supreme Court's current iteration of what is and is not curtilage, or how we figure that out. We're looking back retrospectively at what officers knew or should have known about the law at the time, and everything you're telling me is, it wasn't clear enough. I didn't mean to argue that, and I'm not saying that. What I'm saying is that those officers knew very well what they were doing when they met at the Coventry Police Department and planned the whole thing out to gain entry through Lieutenant Selinsky. They knew that without that consent, that they wouldn't be going anywhere, but the consent was made under arrest. You can't threaten people with hundreds of years in jail, and then when they let you in your house say, oh, he consented to coming in here. It's just not fair. One might think that if you had evidence of a crime in your house, you might prefer not to invite the officers in, but to stand on the warrant requirement. Well, the difficulty with that is, he called his attorney. As an attorney, they're there, they're saying you're a criminal, they're saying you have guns in your house. Don't let him in. Make him get a warrant. I mean, I think the involvement of the attorney shows even more that it was under duress than him just letting him in. Interesting theory. Thank you. If it pleases the court, my name is David Yale. I represent the local police officers from the Coventry Police Department. It appears that as far as Lieutenant Solinsky's initial entry, that that is not an issue from listening to the argument and reading the brief, so I'm not going to address that issue unless the court has specific questions about it. There are four ways that the Coventry Police Department defendants would succeed in defending this appeal. Basically, their arguments are contained that the yard is not curtilage, and that is an evolving area of the law, of course, with the recent cases. That they would be entitled to qualified immunity in their determination that the yard was not curtilage in 2011 because of the state of the law at the time. There's also arguments that because the officers were not conducting any search or any investigation, they were merely taking a position of cover in a situation where they were told that there were machine guns in a house and multiple firearms, that they were taking a position of cover not to investigate this issue but merely to protect the officers that were going to go and knock on the door. That it doesn't implicate the Fourth Amendment. At most it might be a state tort trespass. And finally, that they would be entitled to qualified immunity for making the determination that no search warrant would be required to take those positions of cover. And as I said in my brief, those are four independent ways that they would be . . . Is it your view, just so I'm clear, that the mere fact that the Kaminsky property is . . . that because the area behind the Kaminsky property is open to the public, that it does not constitute curtilage? That's correct, Your Honor. And I understand that the more recent cases come back from that position. But I don't believe that it's been abandoned. There are . . . I don't know if Your Honors have reviewed it, but there's a videotape that's in the record that was actually taken in the Kaminsky yard. And that videotape, which was taken from a normal stance that somebody would have in the yard, shows the lake. If you can see out onto the lake, all those positions in the lake can see into his yard. Of course, the fact that you can see into a place doesn't mean that officers are entitled to go in and search it. You're right. As you say, they didn't search here. Could I just ask, is the record clear as to which side of the stone wall they were on? It is not, Your Honor. Obviously, we have the issue . . . Taken in the light most favorable to the plaintiff, what is the evidence for which side of the stone wall they were on? It would be near the stone wall, because that's what Mr. Kaminsky testified to. There's issues about where the officers were, but the ones that he says he saw were near the stone wall. And the stone wall, I believe if you look at the photographs, you see it's not actually a stone wall. It's more of a retaining wall where the house side of the wall is fairly level to the top. It's not like a big wall that someone could hide behind or use for privacy. It's a buffer between the water and the yard. There's an area near the lake. I don't know why it was built, Your Honor. I'm assuming it's because of erosion from the lake, but I don't know that. That's a supposition. There's also another point, isn't there? Even if someone is on the curtilage, for example, if you walk up on somebody's porch, you've entered the curtilage, but there's an implied privilege to the public to come and knock on your door or ring your doorbell. And one of the things that's interesting to me about this situation is that the front door is apparently sort of nailed shut. I think that's a little overdramatic way of putting it, but that's the basic idea. And there's a path that leads around to the back door, which is the only place to seek entry to the house. Now, I should think that all of the officers were entitled to go there, and it strikes me as a little peculiar that if some of the officers back away, perhaps so as not to present too intimidating a presence when consent is being sought, that they wouldn't have been in violation of anything if they were standing on the porch seeking entrance, but the fact that they back off to a further distant point suddenly violates the Fourth Amendment. Your Honor, I don't think that it does. In this case, and we don't have any other facts other than what we have on the record, but it makes sense that the officers are not going to want to stand in line directly at the door of someone that might open the door for their own safety. And the only way that those officers can provide safety for the 1 in 10,000 chance, admittedly, that it could be a danger, is to take basically hiding behind a tree or being near a stone wall. In this case, Mr. Kaminsky, I believe he testified, so they could jump behind the wall because of a dangerous felon like me, something like that. If we were to tell officers that they can't do this type of thing, imagine this scenario where 3 o'clock in the morning, officers go to a house, there's loud music that's disturbing the neighbors, the person who lives at the house is known to have firearms, he's fought with the police prior. The officers have, we left with the option of asking for a warrant if they want to go take a position, a cover in this person's yard so that the officer knocking on the door to deal with the loud noise, to protect that officer just in case this person does come out with a gun. So are we going to tell police officers they have to do that, they have to stop at 3 a.m. or not investigate the loud music? What alternatives are we going to give the officers when we have a, even if it is curtilage, even if it is a question that it was curtilage, the de minimis interference in the privacy right by taking a position of cover behind a tree, how does that implicate a reasonable expectation of privacy? I believe society as a whole would say that's something that police should be able to do. Can you clear up something? There appears to be, and you can help me with this, a discrepancy between the Rule 56 statement filed in support of the first motion for summary judgment and the second Rule 56 statement in this sense. If you look at the first motion for summary judgment, it says that Dexter, and I'm quoting, assisted in physically carrying the firearms that the plaintiff was turning over from his home and loading them into police vehicles. The second Rule 56 statement says, along with an affidavit from Dexter, filed in conjunction with the second motion for summary judgment, saying that Dexter waited outside and after Madsen, Selensky, and Abimbo went inside, and I quote, left his position around the Kaminsky home. That's correct, Your Honor, and he came back. And he came back? He went back to his cruiser, and they called him at a later time after some time, after they had gathered the weapons, and then he came back and assisted in removing the weapons to the police car. I do understand where that might create a confusion, but with that explanation it makes total sense. Thank you. If there's no other questions, thank you, Your Honors. Good morning, Your Honors, and may it please the Court. I'm Assistant Attorney General James Belforti, and I represent the State Appellees in this case. I just want to address the knock and talk issue, because that's what really impacts the detectives Madsen and Abimbo, who were the two state police detectives in this case. Can I ask you, before you address that, and you'll certainly have time to address that, a bit more about, if you could tell us a bit more about the process. In other words, if there had been a little more investigation before heading off, going off to the Coventry Police Department, would some of the problems here have just been avoided? That is, if there had been more research done about the 1964 Connecticut statute. Honestly, Your Honor, I don't know if that's true, because it took a while for all the lawyers and the people involved in this to figure out the actual state of the law. But even if that were the case, even if Detective Madsen's conduct was in some way negligent, that's not enough to support a 1983 tort, as we have in this case. I would also point out that cases like US v. Santa, which shows that reliance on a database like NCIC, or in that case it was a statewide database in the state of New York, is not a basis for a Fourth Amendment violation. So I don't think, and I think it's important here also, that even Plaintiff's Counsel at the time, Attorney Weissman, was apparently of the impression that Mr. Kaminsky was a felon as well. So whether or not it could have been avoided, I mean, I suppose it's possible, but I don't think that's required under the Fourth Amendment. I don't think that— Mr. Milleforti, I guess, I take it you can tell us today that it was only a misdemeanor? That's the ultimate resolution of the legal issue? Yes, Your Honor. Is there anything in the record that says anything about when that was discovered or figured out? I don't have that at my fingertips, Your Honor, but I know it was post hoc by— And eventually Mr. Kaminsky was pardoned for that offense, is that right? It's true, Your Honor. And do we know when that happened and how that impacts us? Because I was sort of under the impression, which could be totally mistaken because I don't know that the record goes into this at all, that at some point they just decided, well, let's just pardon the guy, it's not really a problem. And I don't know when, if ever, the people involved in the case came to the conclusion that he was not, in fact, a felon. Yes, Your Honor. And I apologize, I didn't handle the case below, so I don't know the exact timeline of that. I think to the extent it's not reflected in the record, it's because it's really not all that relevant to the conclusion. And I think it's also, I mean, a fact that might be pointed out is that most of Mr. Kaminsky's weapons were returned to him after the fact. I mean, with the exception of three of the assault weapons, that's a State issue that's being litigated in the State courts as we speak. But I think what the— As to whether he's allowed to possess— As to whether he's allowed to possess those three weapons. But that's kind of far afield from the issue. I think the main issue here is that appellant's counsel seems to be this Court to overturn the knock-and-talk rule. I just don't think that's warranted in this case, particularly given that the Supreme Court has recognized the existence of that rule for a long time, including cases like Carroll and Jardine and Kentucky v. King. In fact, in Carroll, the Supreme Court cites this Court's decision in U.S. v. Tightmore endorsing the knock-and-talk rule. And in Tightmore, that was a case where there were two doors that the police officers could have gone to. In this case, there's really only one door. I believe Your Honor said before that, you know, saying it was nailed shut would be too dramatic. I don't think it's too dramatic, Your Honor, because that's what the plaintiffs say in their statement of uncontested facts. It's in Joint Appendix 507. I was just going by the video. It's not like it's got an X-shaped, you know— Yes, Your Honor. —barricaded door. But there are those, I don't know what to call them, clamps or something that are nailed that put some sort of glass or plastic and make it impossible to enter. Yes, Your Honor. But I think it's fair to rely on the plaintiff's contention that it's nailed shut. So there's one door in this house. And they drive on the driveway. They knock up to the door. They knock on the door. They ask if they can come in. And then Mr. Kaminsky says, and this is from his statement of uncontested facts, Joint Appendix 515, so they—I left the door open and I waved them in. And that was—and is that before they told them the reason for their coming? Yes. Yes, Your Honor. They don't mention anything about what's going on in the exchange at the door is, hey, he says, hey, Walt, what's going on? He says, can we come in? He says, and then I left the door open and I waved them in. And then at that point, Mr. Kaminsky engages with Detective Mattson. He provides his number to his attorney, Detective Mattson, and then calls his attorney. And then his attorney tells him he's going to cooperate with you. And then he does cooperate with them by going through the house and collecting his weapons and handing them to the state police. But it had been a different—possibly a different situation if before he waved them in, they had said, you're a convicted felon and we need to talk to you. Your Honor, I—it might impact it because it's a totality of the circumstances test, but I don't think saying you're a convicted felon and we need to talk to you is tantamount to, we're going to arrest you or we're going to get a warrant if you don't—if you don't let us in the house. So I think that's a much different thing. And the plaintiff's point that— In that circumstance, you know, arguably, it could—certainly the argument could be made that it's not a freely given consent, but a sense of coercion. If somebody says to you, you're a convicted felon, we need to see you, can we come in? I think you're right, Your Honor. The argument could be made, but I think given the totality of the circumstances in this case—and that would be a key fact if that were—but in this case, we don't even have a hint. I'm not sure I've ever seen a case in which taking only the plaintiff's testimony, the police behavior was more civilized than what was here. I've seen plenty of cases where the police say their behavior was at least this civilized, but one where you don't have to look at what the police say at all, but only at what Mr. Kaminsky says. This is about as uncoercive an episode as I have ever seen. I tend to agree, Your Honor. I think sometimes no good deed goes unpunished. I mean, they could have presumably gotten a warrant and come to arrest him, but they didn't do that. They knocked on the door and tried to settle the issue, because he is an older man. And I'm sorry, Your Honor. So on that issue, let me just ask one thing that I find interesting, at the very least. How did the issue or the suggestion that there were machine guns, which obviously is different from an assault weapon, get into the case? Does the record indicate that somewhere? So, Your Honor, that has to do with Detective Mattson's, I guess, preliminary investigation before they go to the House, because they had realized that he was an FFL holder, as Appellant's Counselor pointed out. Even FFLs can't possess machine guns without a license from the Secretary of Treasury. But anyway. That's true, Your Honor. But how did the machine guns come up? I believe, Your Honor, it was during the initial investigation when they determined that he had been registering certain weapons for years, so they knew that he was in possession of machine guns. They were not necessarily aware that he was in possession of the assault weapons, which, as Your Honor pointed out, is a different animal altogether under Connecticut law. But, I mean, they were aware that he had machine guns because he had registered them previously. Okay. Thank you. If there are no further questions, I'll close my argument. Thank you, Your Honors. So, addressing that issue, the final issue about the machine guns, the law in Connecticut is that if you have machine guns, you send an annual registration in to the State Police, which Mr. Kaminsky did lawfully. And the State Police knew he had machine guns. They sent him out a notice every year to say, do you still have these machine guns? And in fact, he still receives those notices, even though he hasn't had the machine guns in years. And then he just sends it back and says, yes, I have the machine guns. The issue with the assault weapons was, there's an issue in Connecticut, Reuben Bradford, the Commissioner of the State Police, said anything manufactured prior to September 13th, 1994, is not an assault weapon. And then all of a sudden, when the new Commissioner came in, she said, well, that only applies to certain assault weapons manufactured prior to September 13th, 1994. So, Mr. Kaminsky, these are contraband. So there are three guns that are at issue. Whether Reuben Bradford's official pronouncement was sufficient for residents in Connecticut to rely on or not, and we're waiting for an appellate court decision in that case. But the three guns were not returned to him because he's not allowed to have them. It's that the state ruled they were contraband, and that's why they weren't allowed to get back to him. With regard to the issue of the officers stationed outside on the curtilage because they were providing some sort of cover, I deposed Detective Mattson, I deposed Detective Mbimbo. I said, when you went in the house, did you touch Mr. Kaminsky to see if he had weapons on him? Oh, no. Did you know if he had guns laying around anywhere? Oh, no. Did you take any protective measures whatsoever when you went in that house? Oh, no. They knew there was no danger. They didn't act like there was any danger. So the lawsuit with respect to the three officers on the curtilage is based solely on the fact that they were standing there. That they — And that's trespassing on his curtilage. That — well, that they were standing there, and for what purpose they were standing there. Well, for what purpose were they standing there? Did they search anything? They were — Did they look under the overturned canoes? Did they look in a shed? Did they look through bushes to find things? They were part of the investigative contingent that was there searching. The question is, what did they do other than stand on what is arguably curtilage? They stood on the curtilage, part of an investigation to seize the firearms from Mr. Kaminsky. And I just want to say that we're not saying that the police should have gotten an arrest warrant before they got there. I know that was brought up in one of the arguments. It's a search warrant that they should have gotten before they arrived there. For example, there was some talk about, OK, it's OK to go on the porch. Is the case law suggesting that it is a Fourth Amendment violation for an officer to stand on a piece of someone's property that is curtilage without consent and without a warrant? Well, you know what? There was a first summary judgment motion in this case. Yeah, I didn't — The judge brought up — Excuse me. I didn't ask you about the first — The district court judge thought there was. Well, what was it? He's the one that brought it up. I'm sorry. Could you — I asked you, are you aware of a case that says that? Because the Fourth Amendment talks about searches and seizures, and I'm not sure that these people were searching anything, and they didn't seize anything on the curtilage. The only seizures took place in the house, in the first instance, by the officers who went inside the house. So I'm trying to understand what is the Fourth Amendment violation other than a trespass on property. And that might be a violation, but if there is, I'd be curious as to what case law establishes that. We — I do not know. But we are going by their presence at the property aided and abetted and assisted the search that ultimately resulted in the house. And I — A consensual search that happened in the house. We do not agree. OK. And going to the issue of the officers, well, wouldn't it have been OK if they were standing at the doorstep? Our argument is that there's a license, yes, for some people to come to your doorstep. For example, the mailman has a license to come to your doorstep. But does he have a license to come to your doorstep, knock on the door and say, can I come in? I have a big package. And then when he comes in, he's there for a completely different purpose. You know, he's there to say, I want to — you know, I want to take this opportunity to look around your house, or I want to do this. No. He was invited in for a specific purpose. If the owner had known the real purpose and why they were there, he would have never invited them into his house. And it's the same way in this case. When Mr. Kaminsky waved Lieutenant Selensky in, having no expectation that anybody suspected he was a felon — he'd been a federal firearms licensee for years, had a pistol permit issued by the state police, a permit to sell firearms — why wouldn't he have invited Lieutenant Selensky in? Of course he would have. But he wouldn't have invited them in if he knew that they were coming in because there was an allegation that he was a felon, which he knew from the beginning that he was not. He said from the beginning he was not a felon. He would have never invited them in. And nobody would ever invite, for example, a mailman in or anybody else in if they didn't know their real purpose. Yes. Thank you. Thank you. Thank you. Thank you all for your arguments.